UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )   Crim. No. 1:08CR194 |
| | )   The Hon. T.S. Ellis, III |
| OSCAR OMAR LOBO LOPEZ, | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION FOR A NEW TRIAL

COMES NOW, the Defendant, OSCAR OMAR LOBO-LOPEZ, by and through counsel, and in support of his Motion for a New Trial, filed herewith, hereby states as follows:

## BACKGROUND AND PROCEDURAL POSTURE

On April 21, 2009, Oscar Omar Lobo-Lopez was convicted by a jury of Murder in Aid of Racketeering, Conspiracy to Commit Murder in Aid of Racketeering, and Use of a Firearm in the Commission of a Crime of Violence Causing Death (in violation of 18 U.S.C. Secs. 1959(a)(1) & (a)(5); and 924(c)(1)(A) & (j)) for the shooting death of Melvin Reyes, a/k/a "Pelon," on May 5, 2007 in Springfield, Virginia.

At trial, the only purported eyewitness to testify was the co-defendant, who had earlier entered a guilty plea – Sergio Amador Amador, a/k/a "Dado." He testified that he and Mr. Lobo Lopez had shot the victim, but his trial version was "new" in that he reversed the roles of the shooters, claiming responsibility for the fatal head shots for the first time on the witness stand. At his plea hearing only weeks prior, Dado had described these crucial, close-range shots as having been fired by Mr. Lobo-Lopez. When questioned in 2007, Dado claimed not to have had anything to do with the shooting at all.

1

In the days and weeks leading up to trial, the United States notified Defendant's counsel of Carlos Baldimir Montoya, a/k/a "Ciego," who claimed to have helped plan and look for the victim, as well as to have been the driver of the vehicle taking the shooters to and from the scene of Pelon's murder. However, Ciego was adamant that *neither* of the co-defendants was present. Instead, he stated that two other gang members and a younger prospect were present, and that two of *these* people committed the shooting. Despite his confession, Mr. Montoya was not charged and was a free man until Mr. Lobo Lopez' counsel interviewed him at his home with their investigators. Mr. Montoya was appointed counsel the following morning, who advised that Mr. Montoya could not be interviewed further and would invoke his Fifth Amendment right if asked any questions about the shooting at trial. Without a first-hand account available for the jury to hear, no corroboration, and the risk of damaging rebuttal evidence, counsel for Defendant Lobo-Lopez made the tactical decision not to try and present Mr. Montoya's statement through their investigator at trial. The defense rested without presenting any evidence.

On September 18, 2009, Mr. Lobo-Lopez was sentenced to life in prison plus ten years. An appeal to the Fourth Circuit Court of Appeals is pending, and a briefing schedule has issued directing that Appellant's Opening Brief and Joint Appendix be filed on or by July 1, 2010.

After sentencing, Defendant's counsel received a lead on a potential defense witness whose identity was protected in the early part of the case and who had, by the time his name was revealed, left the country. This individual, believed to be in Honduras, had told police he did not see Defendant at the scene. Counsel was not granted additional funding to further investigate or track down this individual.

On April 2, 2010, counsel was notified via letter that an individual housed at the Alexandria Detention Center and known to be a member of MS-13 "provided information to

federal law enforcement officers about a hit on an 18th Street member on Commerce St." He stated that he was at a house in Springfield frequented by many gang members when a call came that an 18th St. member had been killed. At the time the call came in, he says that Lobo Lopez and Dado *were at the house with him*. He states that approximately 40 minutes later, two men came to the house and received congratulations. One of these men was already a member of the gang, the other was a younger prospective member. He later heard that each of these two men had a gun, but that one of them had jammed, so the older gang member held the hand of the younger prospective member to help him shoot the victim. Later that night, the younger recruit was jumped into the gang. The two people returning to the house to receive congratulations were the same people described and/or identified by Mr. Montoya in his statement to Defendant's counsel and their investigators. Furthermore, this individual says that he spoke with Mr. Montoya at the jail, and that Mr. Montoya told him the *same version* that he had told Defendant's counsel and their investigators. The two theorized as to why Dado had pleaded guilty, and Mr. Montoya reportedly stated that the FBI had a tape of Dado's parents pleading with him to cooperate. They also speculated that "too many witnesses" would say he was there. In fact, no other trial witness did.

Although his statement matches in all other respects with what Mr. Montoya had reported, the individual places this event in late summer, and the murder of Mr. Reyes occurred in May, 2007. In addition, he reportedly identified the younger recruit - the fatal shooter - through photographs, as a young man who was incarcerated at the time of Mr. Reyes' murder.

## ARGUMENT

To receive a new trial based on newly discovered evidence, a defendant must demonstrate: (1) the evidence is newly discovered; (2) he has been diligent in uncovering it; (3)

it is not merely cumulative or impeaching; (4) it is material to the issues involved; and (5) it would probably produce an acquittal. *United States v. Fulcher,* 250 F.3d 244, 249 (4th Cir. 2001).

As noted, this information – including the very existence of the individual housed at the Alexandria Detention Center – first became known to Defendant's counsel on April 2, 2010, as a *Brady* disclosure post-trial. Since then, Defendant has requested by and through counsel to interview the individual and has requested of the United States information as to the identification of the younger prospective member referenced by the incarcerated individual. Both of these requests have been refused. This evidence would not be cumulative, but would corroborate evidence available only second-hand (due to Montoya's invocation), as well as broaden the jury's perspective, to include the events occurring immediately after the shooting. The materiality of the evidence is self-evident as it directly implicates others as participants in the murder and exculpates Defendant.

The Court's final consideration is whether this new evidence would probably result in acquittal. In this case, the only person claiming Defendant was present was Dado. Dado himself, for whatever reason, pleaded guilty and could only receive a reduction for "substantial assistance." There being at that time only one co-defendant, cooperation with the government's theory was – a jury could well believe – his only viable option for getting out of prison alive. Discovery led the defendants to believe that Dado would be identified by at least one, if not two, additional eyewitnesses. These circumstances certainly created motivation for Dado to incriminate Defendant at trial. As it is, Dado's story changed with respect to a *major* detail, even *after* his statements made under oath regarding his role in the shooting. Setting this against the statements of two people with *no* apparent interest (Mr. Montoya, for one, offered his confession

to law enforcement and an *identical* statement to counsel and investigators before he was even charged) – statements which *corroborate* one another - and a jury would *very* likely acquit Defendant.   Even were Mr. Montoya, a/k/a "Ciego," to invoke his Fifth Amendment right, *his* statement coming in through an investigator would be far more effective as it would now be corroborated - *not only* by his identical statements to law enforcement and his fellow inmate, but also by what the fellow inmate himself observed on the night of the shooting.  Any discrepancies in the time of year or the identification of the younger recruit would be matters for cross-examination, and the jury would thereafter determine his credibility and the weight of his evidence overall.  Given the lack of any additional eyewitness testimony inculpating Defendant, Dado's history of lying under oath, and his obvious interest in assisting the United States, the newly discovered exculpatory evidence would be given *great* weight by a jury.

WHEREFORE, based on the enormous exculpatory value of the newly discovered evidence and the strong probability that had this evidence been available at trial, an acquittal would have resulted, Defendant respectfully prays that this Court vacate the judgment entered herein and grant him a new trial.

> Respectfully Submitted,
> OSCAR OMAR LOBO-LOPEZ
> By Counsel

RICH ROSENTHAL BRINCEFIELD MANITTA DZUBIN & KROEGER, LLP

By:_____/s/_____.
Lana Manitta, VSB #42994
201 N. Union St., Ste. 140
Alexandria, VA 22314
(703) 299-3440
FAX (703) 299-3441
LMManitta@RRBMDK.com
Co-counsel for Oscar Omar Lobo-Lopez

LAW OFFICES OF JOHN C. KIYONAGA

By:_____/s/_____.
John C. Kiyonaga, VSB #
526 King St., Ste. 213
Alexandria, VA 22314
(703) 739-0009
FAX (703) 836-0445
jkiyonaga@earthlink.net
Co-counsel for Oscar Omar Lobo-Lopez

**CERTIFICATE OF ELECTRONIC SERVICE**

I HEREBY CERTIFY that on May 3, 2010, I electronically filed the foregoing with the
Clerk of the Court using the CM/ECF System, which will send notice of such filing to the
following registered CM/ECF users:

| | |
|---|---|
| Patricia Giles, Esq.<br>Assistant United States Attorney<br>2100 Jamieson Ave.<br>Alexandria, VA 22314 | Joseph McCarthy, Esq.<br>510 King St., Ste. 400<br>Alexandria, VA 22314 |
| Morris Parker, Esq.<br>Assistant United States Attorney<br>2100 Jamieson Ave.<br>Alexandria, VA 22314 | Jeffrey Zimmerman, Esq.<br>908 King St., Ste. 350<br>Alexandria, VA 22314 |
| Zachary Richter, Esq.<br>Assistant United States Attorney<br>2100 Jamieson Ave.<br>Alexandria, VA 22314 | |

_____/s/_____.
Lana Manitta